We will call the next case, Melissa Braun v. Nutrition Management Services Company. Mr. Epstein. May it please the court, my name is Alan Epstein and I'm here and privileged to represent Nutrition Management Services Company in this matter. I would like to reserve three minutes in rebuttal if I may. That request will be granted. This is an interesting situation, your honors, because of time limitations. I'm going to be only addressing the three major portions of my brief and will leave the remaining two regarding liquidated damages and fees to the briefing and to any questions the court may have. Specifically, I'm going to be addressing the first issue as to whether or not the lower court should have granted a new trial or whether it abused its discretion in doing so. Number two, once we get past that issue, if it should have just avoided the new trial scenario and entered judgment, it should have entered judgment in favor of Nutrition Management because under the FMLA, there simply is no room for nominal damages. And the third issue is, once we get into the second trial if we have to, that the court erred in not following the precedent in this court in Conoscenti and other cases, the Parker case and the Third Circuit model jury instructions, wherein they're directed to recognize that there is an absolute defense to a claim for interference. The facts. Not a distraction, your honor. The facts in this case are rather simple and really uncontested, and that's important in the context of the granting of a new trial because the facts really are somewhat uncontested. Nuances of them are not as to how you reflect on them. But when it comes out, Melissa Brown, who had limited education and had experience as a worker and as a mid-level supervisor, was granted the position of food service director, a very complicated process at the Plymouth house home, and was in charge of serving food to the residents of that home. In 2004, a new director came in. At the time, Ms. Brown admits on the record that she had problems on the job, that she was criticized and that she has no evidence to demonstrate that the criticisms of her in not being able to run the kitchen properly were unfounded. The new owner brought in nutrition management, and I'll refer to them as nutrition management, who are people who service facilities like nursing homes and smaller hospitals and provide the service of running the kitchen. They order the food. They have the people who prepare the food. In this particular instance, nutrition management only hired three individuals when they came in. The rest of the workers remained employees of the home, but Ms. Brown and her assistant and the dietician came aboard as employees of nutrition management. Ms. Brown approached the CEO, Mr. Roberts, who's here in the courtroom, and said, I'm pregnant, and I'm concerned about my benefits. And recognizing that they normally don't cover people who come aboard as new employees, he said, we'll cover you. You're here. We'll give you an opportunity to continue, and during that period, during that normal period, we will cover you for your benefits, and did so. During that same period of time, numerous problems arose, and it came to the attention of both Karen Zivileski, her immediate supervisor, who was the regional supervisor, and others, Mr. Blagrave, who was the vice president of operations, Tracy Malloy, who was the dietician assigned to the Plymouth facility, and actually the client, that Ms. Brown just wasn't up to the job that was dictated by nutrition management's standards. These weren't the same standards as before, but Ms. Brown couldn't do the job. And they called her in after consulting with Scott Murray, who was both HR director and a lawyer, who had had 30 years' experience in the field and was well-versed in all of the laws that dealt with these issues, and called her in and said, you're being terminated because it's a 90-day period. We recognize that you're pregnant. We're going to allow you to continue your benefits and continue to be paid those benefits and a vacation, even though we didn't accrue them, through the end of your pregnancy, and we'll allow you to go out now, earlier in the month of October, before you deliver, so that you can collect unemployment compensation as well. She did do that. She collected unemployment compensation. She went back to work approximately, or started looking for work approximately two weeks after her delivery, which was the time that she told Ms. Zivileski she would need, just two weeks. In that context, Scott Murray also testified, and it's important to note that he was aware of the FMLA. He was aware of the issues regarding credited time from a successor corporation, and that he was well aware of anti-retaliation processes, and that nutrition management always granted leave to people. In fact, Karen Zivileski testified that she had been out on leave during this same period of time. Suit was brought in 2006, two issues. One was an interference claim. It doesn't implicate the Erdman decision, which dealt with the difference between interference claims and retaliation claims. It was only brought as an interference claim, and went to both juries as an interference claim. And it was also brought under the Pregnancy Discrimination Act, which is part of Title VII. The first trial ended in a decision by the jury that effectively required a judgment to be entered on behalf of nutrition management. The jury found that there was liability, successor liability on the part of nutrition management. They went down the factors, the six or seven factors that were involved. They decided that there was liability under the FMLA, because as this court knows, and each of the judges has been involved in FMLA cases, it's a very narrow burden. It's not quite strict liability, because you do have a defense, that I would have fired them anyhow. But the fact is, it is a very narrow burden on the part of the plaintiff. And they found that liability. They found, however, in pertinent part, that there was no pregnancy discrimination, so that all the damages regarding pregnancy discrimination were off the book. They didn't have to decide those issues. And they found that there was no past or future loss of earnings. All right, let's stop right there. Yes, sir. Was there any dispute about the fact that she had been making $40,000 a year and that she never made $40,000 thereafter or the equivalent thereof? Yes, there was. In other words, was there not undisputed evidence that she suffered some back pay loss? No, the underlying record demonstrates, the transcripts demonstrate, that we contested that very much. She got jobs very shortly thereafter. She was employed as a line worker. How could a rational jury find liability and zero back pay? Because we argue that there was no back pay, that there was no direct loss to her. My colleague, Mr. Platt, argued that she lost something in the area of $60,000 or $70,000. We demonstrated very carefully and outlined to the jury and closed to the jury on the basis that she didn't suffer any loss whatsoever. She came back to work for us less than a year after she left in a much lesser position, one that she could handle, and she's been an employee ever since. She worked during that period on a couple different jobs. But that was a year later. But she worked jobs starting in early January that more than compensated for the losses that she had sustained. She was making more money as a person working a construction job, where she was a flag person, than she had been making with us. She had worked also a secondary job. When we added up all the numbers, there was no loss on the part of this individual. And there was no inconsistency with regard to that, nor has there been any suggestion in this particular case by the judge. So you want that first verdict to stand? Absolutely. She got $225,000 in punitive damage. But they weren't allowed damages. And they weren't allowed damages. And the reason they weren't allowed was because the trial judge erred in the instructions and she did the right thing in reversing herself, did you know that? No, absolutely not, Your Honor. The trial judge made a decision and discussed that decision with us in chambers. That's admitted at page 20, note 6 of Mr. Platt's brief. And she specifically said that, what I'll do is if they come in with a verdict of no pregnancy discrimination but FMLA, I'll just mold the verdict because the jury isn't going to be confused by this. They're giving damages for something they're not permitted to give damages for. And in that regard, Your Honor, I'd like to cite to, and perhaps a little out of order here, to the fact that in Neely, in a case in which Judge Stapleton participated in 1995, generally molding is a generally accepted way of making factual findings consistent. There's absolutely nothing wrong with molding. All the cases cited in our brief suggest that the judge has the discretion to do that. And nobody argued that she didn't have that discretion. We had suggested other methods. We both suggested that she separate it. But she thought it would be better to do it that way. And that's the way it went in without objection. So that we all agreed that that was a viable method. What happened then was, is that – I'm sorry, you're saying that the trial judge committed to molding the verdict if precisely what happened here did happen? Yes, and that's – Where can you show us that in the record? The argument about, or the discussion about that was held in Chambers. Off the record? There was nothing on the record that was placed there. However, there is an admission by Mr. Platt at page 20, note 6 of his brief, where he states in that footnote right near the end – I think it's the second or third line from the end – where he absolutely states that that's exactly what occurred. And both of us said to her, we don't think that that's the best way of doing it, but it's certainly one method that you can use. And nobody had a problem with it, including the judge. I'm looking at note 6, and I don't see what you're arguing. They say there was no requirement that Ms. Brown object because she was the beneficiary of the error. That's the second to last sentence. It says, the court believed – when you read it – Second, Ms. Brown's counsel did inform the court of the limitations on FMLA damages when discussing the jury interrogatories. The court believed that too many distinctions would confuse the jury and that the verdict could be molded. Unfortunately, that discussion is – I'm sorry. You've lost me. You're in note 6? Yes, Your Honor. I'm sorry, 7. I apologize. All right. The number 7 is so small, I just took it as a continuation. Let me take one second to check. It's the next to last sentence, as I said. And if I may read it to the court while you're reading it. Okay. The court believed that too many distinctions would confuse the jury and that the verdict could be molded. Unfortunately, that discussion was held in chambers and was not recorded. We both agreed to that. We both cited to that. There was no argument about that. And, in fact, it was the judge's suggestion that said that this was the best method to use. After the case, without explanation, and disregarding her earlier statements that molding was perfectly appropriate and has been done throughout the history of the circuit and condoned by the circuit. But the error was in her favor, though. It's a very – it strikes me as an odd argument. You're saying that – I guess both sides are saying there was error, right? Not on that basis. I don't think that there was error. Well, if there was no error, then the $225,000 verdict stands. No. The $225,000 is not allowable under the FMLA. And courts all the time, very often, take away damages that aren't allowable under a particular account if, in fact, the jury comes back with no liability on that count. And that's just what Judge Shapiro was doing. And her error wasn't in submitting to the jury her method of joint damages. The error here is not molding the verdict in our favor once they came back that way and disregarding the fact that damages were awarded that weren't allowable. Go ahead. Let me ask you a question about something you didn't reach, but to get it on the floor for discussion. I agree with you that there is an affirmative defense of the character that you describe in your brief, and I agree with you that the charge here in the second proceeding was not ideal. However, it seemed to me that the court – that the charge as a whole told the jury that the plaintiff could recover or could not recover unless she showed that the pregnancy leave was the determinative, quote, but-for cause of the interference, that is, the discharge, and that this required rejection of your poor performance theory. And the net result of this charge arguably seemed to me to be only to relieve you of your burden of proof and put the burden on the other side, which, of course, would be something – a charge that you would not be able to complain about. Now, what do you – do you understand my question? I understand it completely, Your Honor, and I disagree with not the question but the last statement that you made. Her charge was based on Title VII jurisprudence. Title VII jurisprudence has that shifting burden going on. In Title VII jurisprudence, I have a burden of producing evidence that shows a pretext, or they have the burden of showing pretext. She charged pretext terminology. She did not charge that we had an affirmative defense, which they could consider, and she didn't allow a jury instruction in that – she could come forward and be totally exonerated from all liability if we did that. At the same time, in the sentence before, reading what you said, she said, this is almost strict liability. If they stopped her from getting her two weeks' leave, they lose. And then they didn't go on to say, but they can get her off the hook if they prove that they would have terminated her anyhow because she wasn't a good performer. The jury never considered that issue. And in terms of the second argument, second trial, if you get that far, that's the reason that Judge Shapiro was absolutely wrong. And that is the basis of our argument in that regard. Thank you. Okay, we'll hear from Mr. Platt. Good morning, Your Honors. May it please the Court. Elliot Platt for Melissa Brown. Let me just say preliminarily that Mr. Epstein started out with an account of the facts that he said were uncontested. I don't think I need to go into detail here, but they were vigorously contested, almost all of the facts that he claims were uncontested. Certainly, if he were correct, we wouldn't even be here. We'd be on a summary judgment. The basic issue here is what was Judge Shapiro to do with a situation that she created? She charged the jury that they could give damages that were not permissible under family medical leave, and she created a jury questionnaire that specifically told them they could do that. I had submitted a separate jury question sheet that did not have that difficulty. She chose to do it herself. I disagree, by the way, with the account that Mr. Epstein had as to what happened in Chambers. She did not say this specific situation. It was a very general conversation. We'll mold the verdict. But now the verdict comes back, and she determined that it would be manifestly unjust to enter judgment on the verdict. The problem I have with this whole case is it would be manifestly unjust to nutrition management. They're the ones who are saying, don't have a new trial, but her alternatives, I submit to your honors, were true. Either enforce the judgment for the total of $275,000 for Ms. Brown, or do what she did, assume, as she correctly did, her personal responsibility for the problem, for the conundrum, and say the only way to deal with this is to retry the case. Why couldn't she mold the verdict? What prohibits her from molding the verdict? Because to mold the verdict, there has to be a way to make the verdict consistent. That's what this Court has said in molding the verdict in the Laumann case. There's no way. The verdict itself, on its face, in its four corners, is not inconsistent. The jury did what it was told to do. This is not a situation where you have in some other cases where a jury finds liability for one tort and not liability for the other tort, where the first tort is dependent on liability on the second. You see it in conspiracy cases, and the Court's looked at this a couple of times, and I can give you a couple of sites if you'd like. The courts where a jury finds conspiracy liability, but they don't find liability on the underlying tort. So you can't, under Pennsylvania law, when they're doing that, you can't have that kind of liability. You can't have conspiracy without the commission of the underlying tort. That's when you mold the verdict. Here, the jury did exactly what they were told, and what we will never know is what would the jury have done had it been properly charged. Because I believe, and I know we're always in a realm of speculation here, that the jury may well have compromised, the first jury, and said, okay, we'll give her the family medical leave. We really want to give her damages and punitive damages, but we don't have to reach the Title VII or argue about that or find it or make the other, the final leap to find the Title VII liability because we know we can give her compensatory and punitive damages for violating family medical leave. And we know that because the judge told us that, and she put it in the sheet that we're working with. That's the problem that couldn't be undone. And the Mosley case says what the defense wants you to do, you can't do. You cannot pick and choose. You can't cherry pick part of a verdict. And they have shown you no case, no case that allows what they want done here in neither of their briefs, nor did they discuss the cases that I raised, the Mosley case and the prior case, where this Court has looked at situations of verdicts that are inappropriate and said the way to do this is not to pick and choose but to have a new trial. Now, the next point, I think, is that not only was the jury interrogatory flawed, but so was the charge. And the defense never objected to the charge. Judge Shapiro clearly charged that if you find either family medical leave or Title VII, you can give compensatory and punitive damages. There was no objection made to that. And I submit to your honors that there was a waiver, and it was a waiver by Nutrition Management. They've been arguing that we waived it. We had nothing to waive. As I think Judge Hardiman pointed out, the error was in our favor. Now, we did discuss it because, frankly, I'm not pleased that we ended up in this whole situation. But the error in your to the benefit of Ms. Brown, she had no obligation to raise anything or waive it. They had the obligation. They didn't. What about the second trial, Judge Stapleton's point? Don't we have another error there? Wasn't Nutrition Management entitled to try to prove to the second jury that they had a legitimate, non-discriminatory reason for the termination? Oh, and they did prove it. They did try to prove it. It was there. And an instruction that said that. Let me say a few things about that. I mean, it doesn't help much if the trial judge lets you prove it but then won't instruct the jury on it. No, no, I understand. I understand. The first of all, I've argued that I'm not so sure that they're entitled to the defense, but let's assume that they are. The trial judge, when you read her charge as a whole, she really melded the family medical leave and the Title VII in a way that, frankly, I don't think was the best way to do it. You're saying she, in essence, did instruct that? Yes. Can you point us to some specifics? Yes. First of all, while I'm getting that, she consistently told the jury that you can only find the family medical leave violation if it was done because she was pregnant. And I had argued to her that that's not the law. So, again, the charge, if it's unfavorable to anybody, was unfavorable to Ms. Brown. But I think if you will find, and I'm starting here on Joint Appendix Volume II, A251, is when she is talking about really the same standards for family medical leave and Title VII. There's another point I want to make, too, about this. But I think if you follow through from those pages, you will see that it's all together. She never separates out family medical leave and says, here's what you have to find for this, and separately from that, Title VII. It all comes together in a way that I believe was unfavorable to the plaintiff. But the other point that I want to make about this is she did charge it in the first charge, in the first jury charge. And in the charge conference, or one of the colloquies in the second trial, she said, I'm going to give the same charge I gave the first time, except with some modifications because of the problem that we had. So the assumption certainly was that she was going to give the charge about the defense. Now, she did disagree, and she did say that she will charge the Third Circuit model instruction. All right.  But show me where in here she instructed the second jury that they had that defense. Okay. While you're looking for that, I might remark to both counsel, this case strikes me as an object lesson as to why counsel, even in contentious litigation of this sort, really are advised to get together and present joint instructions that they agree on. We have very able counsel, obviously based on your arguments, agreeing that the first instruction was wrong. Well, why didn't you walk in the first time and agree on what the right instruction was? I'd be hard-pressed to think that the trial judge would not have accepted that had you gone in with joint instructions. But that's just my editorializing for the day. Your Honor, there's an awful lot of hindsight. I guess I didn't say it to chastise you as much as to hope that this might prevent future debacles, if we can all agree this is on some level a debacle. I can assure you that, speaking for myself, I certainly am aware of the learning experience. A252. And here she starts talking about, she started out by talking about pretext on A251. And again, on A251, I have to talk to you about causation and pretext. And she's talking about, and she says specifically, both FMLA and Title VII. And then on 252, she says, if you find their actions were a pretext or an excuse, you can fine for the plaintiff if you don't have to. I'm sorry, what line are you on? This starts at 5 on 252. And goes on to say, you can't question their business judgment. They can hire and fire as long as they don't violate the law. So, starting at line 10. You don't consider the wisdom of their judgment that she was incompetent, but whether that was the reason that she was terminated or whether that was just one of the reasons and the determinative factor was that she was pregnant. And I think what, forgive me, one of the panels suggested, that really shifted the burden to me of their defense. The other point that I want to make here very strongly, though, is that there was no objection to this charge that did not, to the extent that they believed, it did not include their defense. There was no objection to that charge. And the only thing that you will see. They proffered their own charge, though. That's, our case law is pretty clear. That's sufficient to preserve it for appellate review, isn't it? Except that here, the judge said, I'm going to give you that charge. The judge said, I'm going to charge the model charge. And she had done it in the first case. And so, when she says she's going to do it, and if they believe she didn't do it, they had to object at the end of the charge or they have waived it. And I submit to Your Honor, they have waived it. And I could find those other sites if you need them, but that's in the record that she said all of those things. I want to address something else. Judge Stapleton, there is no way anybody could have looked at this record and said there was no wage loss. Absolutely no wage loss. No back pay loss. No way. She never made, no matter what she did, and still doesn't, the same amount of money that she was making in the job from which she was fired. The issue that they tried to create out of this was that their only liability for assuming a family medical violation would be for the two weeks that she was going to take off. And they paid her two weeks vacation so they didn't owe her anything. That's all that they had to say about it. To me, the violation, as the jury found, was terminating her. And when you're terminated, you have to have a right to the pay that you have lost up until the time of trial. And there was no dispute about the fact that her earnings have never, ever reached the point that where she was making the $40,000 before. Do you want to address the front pay issue at all? Yes, very briefly. I believe that under family medical leave, that's an equitable remedy that the court has the discretion to award. But it is the court's job to award. It went to the jury. Frankly, I may be one of the few people around who believes that under Title VII, front pay is a jury issue, the way Section 1981A is written, where it says that compensatory damages includes future economic loss. I realize that nobody's really looked at it that way and that the courts are saying that under Title VII, it's pretty much an equitable remedy. But under family medical leave, reinstatement is an equitable remedy, and the issue of front pay is in lieu of reinstatement. And the problem that I have in this case is that even if the jury was an advisory jury, they did not decide. The second jury did not decide front pay. They didn't put zero. They said, omit per judge's instructions. And I believe they were confused about her instruction about not reducing it to present value. But certainly – Did you submit proposed instructions or a proposed verdict form on that at the second trial? The same one I had from the beginning, yeah. And the verdict form, it said, do you award front pay, and if so, how much? That I frankly don't think was an error on Judge Shapiro's part. I think it was a misunderstanding by the jury. But my problem with the front pay is that I believe Judge Shapiro had the discretion to address front pay, but she did not exercise that discretion because she looked to what the jury said, and she read that as a zero finding, and she felt bound by it. I don't think it was either. I don't think she was bound by it, and I don't think it's a zero finding. So that's why I think the remedy there is for her to be asked to exercise her discretion on the front pay issue, which I think was a reasonable request that it went ahead. All right. Thank you, Mr. Platt. Thank you. Mr. Epstein, rebuttal. It's been stated by Mr. Platt that we didn't raise the issue regarding the inconsistency issues in the first trial. The Washer case, which was cited in our reply brief in response to his citation of cases that were clearly inapplicable, said that the jury answers don't have to be inconsistent. In that case, the court allowed the jury to determine damages based upon Title VII case law instead of the age discrimination limitations in the Age Discrimination Act, and the jury found damages for back pay in a circumstance which weren't allowed, where there was no liability. This court affirmed the district court's grant of a 59E motion to amend that judgment and to mold the verdict. And in that case, clearly, that dictates what happens here. With regard to the other arguments, the speculation that the jury – have the district judge determined front pay, the amount of front pay? There's an inconsistency in that argument for Mr. Platt, and the answer is no, Your Honor. And the inconsistency is he's saying you can't mold the verdict to disallow the $225,000 or $75,000 that was awarded by the jury where the damages weren't allowed. And clearly, you could just lock that off and have a perfectly good verdict because they weren't allowed to give those, and it was no harm, no foul. You can't speculate that they would have done something else. On the opposite end, he's asking the court to do something where he's asking the court to go back and award damages that Maxfield and the other cases in this jurisdiction say go to the jury, and to mold the verdict and to make decisions that the jury rejected, clearly rejected. It's just a disparity. What did they reject? They said, per the judge's instructions, we're not answering this. Correct. And the judge explained that, that she believed in her opinion, and I think rightfully so, that if you don't find front pay, we don't answer. The additional issues as to the first verdict, and that's so important, I mean the first jury trial, is that that could have been molded easily. It was clear what the jury was doing. It was being passionate about somebody losing a job, but it wasn't allowed to give those damages. All she had to do was draw that bowler sense, that line, and say, this doesn't count anymore, and that's the end of the case. Once she formulates that with the FAMLA, it's concluded. What I ask the court to do is to allow this case to be ended. After two trials and an appeal, it should end after the first trial, and this court should allow there to be a remand only for the purpose of having the court enter judgment for nutrition management and against Melissa Brown. Are there any other questions? Oh, as to front pay, I think I covered it, but the Maxfield decision just covers that. The court can't do that, Judge Stapleton. I want to leave you with one last thought. Each of you has been involved in cases involving this very question of molding in new trials. In Hamden, and I'm going to read from Judge Hardiman's decision, where it states, new trials because the verdict is against the weight of the evidence, because the jury found something that the court wouldn't have, are only proper when the record shows that the jury's verdict resulted in a miscarriage of justice, or where the verdict or the record cries out to be overturned or shocks our conscience. There's nothing in this case as to that first trial that would allow this court to find that Judge Shapiro was shocked, that her conscience was moved such that there was a miscarriage of justice. The jury found what it found. It's just such an odd argument. You're saying that it was not a miscarriage of justice that you got hit with a $225,000 verdict. Your Honor, I didn't get hit with that verdict. But you can't take the good and leave the bad. Yes, you can, Your Honor. I can't find one case that provides the sort of relief you're asking for here. I would ask, Your Honor, to read the Watcher case, which was cited in our brief, which is a reported decision of this court. I can give you the site in just a second. That's okay. The Watcher case clearly covers just that issue, that the court has the right and the obligation to mold the verdict so that it properly accords damages in accordance with a finding of no liability. Okay. That's all, Mr. Platt. We thank counsel for their arguments, and we will take the matter under advisement. Thank you.